# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CAREY LUGO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 577** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Maria Valdez** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Carey Lugo's claim for disability insurance benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 12] is denied and the Commissioner's cross-motion for summary judgment [Doc. No. 20] is granted.

## BACKGROUND

### I.     PROCEDURAL HISTORY

On December 20, 2008 Claimant filed a claim for disability insurance and supplemental security income benefits, alleging disability since January 17, 2008.[2]

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

[2] Plaintiff originally filed a claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., as well as supplemental security income benefits under Title XVI of the Act, 42 U.S.C. § 1381a et seq. Although it does not affect the

The claim was denied initially and upon reconsideration, after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), which was initially held in April 2011 in Missouri—where Plaintiff was then residing—but was continued so Plaintiff could obtain representation and additional medical records. (R. 131-42.) The hearing resumed in January 2012, but was again continued so that Plaintiff could obtain representation. (R. 111-18.) A full hearing was then held in May 2012 in Orland Park Illinois. (R. 44.) Plaintiff appeared and testified at the hearing and was represented by counsel. Vocational expert Grace Gianforte also appeared and testified.

On July 5, 2012 the ALJ denied Plaintiff's claim for benefits, finding her not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.     FACTUAL BACKGROUND[3]

### A.     <u>Background</u>

Plaintiff was born on May 25, 1979, and was thirty-two years old at the time of her full hearing. She was working as a certified nursing assistant ("CNA") at a convent until January 2008, when she injured her back while moving a patient. (R. 60-62.) She had previously worked as an accounting clerk, van driver, biller, receptionist, and cashier.

outcome of this case, in her appeal Plaintiff addresses only her claim for disability insurance benefits under Title II.  (Pl.'s Mem. at 1.)
    [3]  The following facts from the parties' briefs are undisputed unless otherwise noted.

### B. **Medical Evidence**

Shortly after her injury, Plaintiff began treatment with Dr. Ilah Heller Bair. Dr. Bair noted that Plaintiff's range of motion was limited by pain in all directions, and diagnosed her with sacroiliitis and sciatica. (R. 617.) Plaintiff underwent an MRI in February 2008, which showed a "tiny central disc protrusion at the L5-S1 level not causing any significant mass effect upon the thecal sac," but which otherwise presented normal results. (R. 627.) Plaintiff was prescribed a course of physical therapy, during which she continued to report pain; however, her range of motion and strength in her extremities improved, and her physical therapist eventually noted that "her subjective reports [were] inconsistent with objective findings of no deficits in lower extremity sensation," and that she was tolerating the therapy well and performing all exercises without difficulty. (R. 633-34.) In March 2008, Dr. Bair noted that, while muscle stretching would help, she believed that Plaintiff's condition "should not keep [her] from returning to work." (R. 642.) Dr. Bair later noted that she did "not feel the discs and bones in [Plaintiff's] back [were] responsible" for Plaintiff's pain, and that her condition "should resolve completely within 3 months" with proper stretching. (R. 647.)

In April 2008 Plaintiff visited orthopedist Dr. Steven Bardfield. Dr. Bardfield noted the MRI results showing "a very small disc protrusion" without "any foraminal or lateral recess narrowing," and with "minimal degeneration in this disc." (R. 580.) Dr. Bardfield found that Plaintiff had a range of motion in her lumbar spine which was "well-preserved in all 3 planes," that her reflexes were

equal in both extremities, and that she showed mild tenderness in her lumbar area. *Id.* Dr. Bardfield concluded that low back pain from the disc problem should be helped by anti-inflammatories and physical therapy. *Id.*

In May 2008, spine surgeon Dr. Kern Singh examined Plaintiff. (R. 512.) Dr. Singh's physical examination found that Plaintiff had full sensation and range of motion in her lumbar spine, and "no evidence of sacroiliitis on examination." (R. 512.) Dr. Singh concluded that he believed that there was "minimal radiographic and objective evidence of disease." (R. 513.) Dr. Singh recommended that Plaintiff be allowed to return to work "at a full duty level without restrictions." (R. 514.)

Plaintiff returned to Dr. Bardfield in June; she reported that the physical therapy had helped her pain in general, but that the pain was made worse when she was seated. (R. 579.) Her range of motion, reflexes, and strength and sensation, however, were all reported as normal. *Id.* Dr. Bardfield recommended more physical therapy, and noted the possibility of epidural injections to help with the "discogenic component of pain." *Id.* At a follow-up appointment in July, Plaintiff reported that the additional physical therapy had not helped, and her pain had increased. (R. 578.) Dr. Bardfield referred Plaintiff to pain management specialist Dr. Gary Koehn for cortisone and anesthetic injections, with the possibility of radio frequency ablation in the nerves of the sacroiliac joint.[4] (R. 506.)

---

[4] Radio frequency ablation is "a procedure utilizing radio frequency waves to heat the nerves surrounding the facet joints, for the purpose of interrupting the transmission of pain signals to the brain." *Decker v. Colvin*, No. 12 CV 4040, 2013 WL 5300641, at *3 (N.D. Ill. Sept. 19, 2013).

Dr. Koehn saw Plaintiff later that month. (R. 507.) He recorded Plaintiff's complaints of pain and suggested an "epidural steroid injection for therapeutic purposes"; Dr. Koehn noted that Plaintiff's complaints of pain could be due to her sacroiliac joint, or potentially from her lumbar spine; he also noted that Plaintiff's injury at that point was "6 months old, and she needs to move on, so to speak." (R. 509.) At a follow-up with Dr. Bardfield, however, Plaintiff declined to pursue injections, opting instead for chiropractic treatment. (R. 510.) In September, she returned to Dr. Bardfield, who noted no new findings and determined to have Plaintiff continue with chiropractic treatment for two to three weeks, after which time he would obtain a functional capacity assessment. (R. 576.) While he noted the possibility of work restrictions, Dr. Bardfield concluded that he would "not be in favor of writing any type of permanent work restrictions as [he] believe[d] her symptoms will continue to resolve." *Id.* However, during 2008 Plaintiff had become pregnant; as a result, at her October appointment Dr. Bardfield was unable to refer her for a functional capacity assessment or further evaluate her capacities for a return to work. (R. 575.)

In October 2008 Dr. Singh performed a third-party medical evaluation of Plaintiff, apparently related to her workers' compensation proceedings. Dr. Singh recorded that Plaintiff reported pain as an eight on a one-to-ten scale, and that the pain interfered with her daily activities and housework, and was worsened by walking and standing. (R. 499.) Dr. Singh's physical examination, however, was normal, with the exception of a "self-limited knee extension." *Id.* Dr. Singh

concluded that he did not believe that Plaintiff's symptoms were "causally related to her work-related injury." (R. 500.) While Dr. Singh diagnosed Plaintiff with a lumbar muscular strain, he found that she had "no evidence on her MRI findings as well as on her examination by multiple physicians to support any of her [other] diagnoses," and that there was "no permanency associated with this injury, and [Plaintiff] should be allowed to return to work at a full-duty level." (R. 500.)

As a result of her reported continued pain during her pregnancy, however, Plaintiff was referred to Dr. Steven Mash at the request of her obstetrician; she saw Dr. Mash in March 2009. (R. 657.) Plaintiff complained to Dr. Mash of "increasing low back discomfort which is unremitting." *Id.* Dr. Mash, however, found that, "from an orthopedic perspective [he did] not feel she ha[d] an emergent problem," and he was unable to provide further treatment due to her pregnancy. *Id.*

In April 2009, Dr. B. Rock Oh, a state agency consultant, performed a residual functional capacity assessment based on Plaintiff's records. Dr. Oh noted the reports of Plaintiff's medical providers, along with her complaints of pain, and determined that the limitations Plaintiff alleged were not fully credible given the contrary reports of Drs. Singh and Mash, her otherwise normal evaluations, and the minimal evidence of disk protrusions shown on the MRI. (R. 705-06, 710-11.) Dr. Oh concluded that Plaintiff was capable of lifting 50 pounds occasionally, twenty five pounds frequently, standing or walking and sitting for a total of six hours each in an eight-hour workday without other significant limitations. (R. 706-08.) This

assessment was affirmed on review by state agency physician Dr. Richard Bilinsky in August 2009. (R. 747-49.)

In August 2009 Plaintiff, also began treatment at the office of Pain Specialists of Greater Chicago, in particular with Dr. Ira Goodman. (R. 773.) In September of that year, Plaintiff received a facet joint injection of the lumbar spine, which was repeated in October 2009. In April 2010, Plaintiff was examined by a physician's assistant in the Pain Specialists' office, who reported that, since her December 2009 office visit, Plaintiff's pain had stayed the same. Plaintiff described "temporary improvement in pain and function," and displayed "normal behavior and no pain behavior." (R. 758.) Plaintiff reported sleeping only five hours per night, and being awakened by pain two to three times per night each night. (R. 758.) She also reported that she needed to sit or lie down several times during the day because of her pain. (R. 758-59.)

At her May 1, 2010 appointment with Dr. John Broadnax, however, Plaintiff reported that her pain had increased by fifty percent. (R. 761.) She underwent a medial branch nerve block in May 2010, and was scheduled for "radio frequency of the lumbar spine" in February 2011. (R. 756.) She returned on May 18, and reported that her pain had increased again, this time by 100 percent. (R. 764.) She reported that her pain at its least scored ten on a one-to-ten scale. *Id.* She also again reported problems with sleeping and the need to lie down during the day. *Id.* At a May 26, 2010 follow-up, Dr. Goodman recommended lumbar radio frequency ablation and a subsequent follow-up appointment. (R. 766-67.) Although Plaintiff

had stated that her pain condition had been exacerbated by prior treatment, Dr. Goodman expected the procedure would adequately treat her pain. (R. 766.)

At her September appointment with a physician's assistant, Plaintiff had yet to undergo the radio frequency ablation. However, she again reported that her pain had increased. She reported that her medication provided no relief and that it had stopped working, and asked for a new prescription. (R. 768.) She continued to report the problems with sleep and the need to lie down during the day to control her pain. *Id.* Plaintiff reported to Dr. Goodman at an October follow-up that her pain had remained the same; Dr. Goodman again recommended the radiofrequency procedure, and Plaintiff "anticipate[d] having this done during one of her frequent trips to the Chicago area." (R. 772.) Similar complaints were made at follow-up appointments with Dr. Goodman in February (R. 775), March, May 9, 16, and 26, and September 2011, and in February and April 2012.

In April 2011, Plaintiff underwent a second MRI. Similar to the 2008 MRI, the physician reviewing the second study noted "central annular tearing and a tiny central disk protrusion resulting in mild compression of the ventral thecal sac without significant central spinal canal or foraminal stenosis. The remainder of the lumbar spine is unremarkable." (R. 788.) After reviewing the MRI, however, Dr. Goodman concluded that he thought "the current disc abnormalities could explain her complaints, especially the findings at L5-S1." (R. 795.)

In May 2012, Dr. Goodman filled out a "Pain Report" for Plaintiff. (R. 814-15.) Dr. Goodman listed diagnoses of "lumbar discogenic back pain, lumbar

radiculopathy, lumbar facet syndrome, myofascial pain, other chronic pain, [and] sacroiliitis." (R. 814.) Dr. Goodman, however, did not reference any medical evidence supporting his decision or otherwise provide a narrative of how his conclusion was arrived at. In his report, Dr. Goodman also checked "Yes" next to the statement, "Does your patient's pain markedly impact upon the ability to sustain concentration and attention, resulting in frequent failure to complete tasks?", and "No" next to the statement, "is your patient able to function in a competitive work setting . . . on an eight hour per day, five days per week basis?" (R. 815.)

C.  **Plaintiff's Testimony**

Plaintiff testified that she had graduated from high school, and was a certified nursing assistant. (R. 52.) She testified that she lived with her two children, ages fourteen and three. (R. 54.) The last time she had worked was in January 2008, prior to her accident. (R. 58-59.) Plaintiff testified that she was unable to work because of her pain, which made it difficult to sit or stand for long periods of time.  (R. 59.) She stated that driving also affected her pain, and that she had difficulty concentrating. (R. 60.) Her pain, on an average, rated eight on a one-to-ten scale and, on a bad day, rated a ten. (R. 62.) She testified, however that every day was a bad day, and so every day her pain would reach a level of ten. (R. 63.) The pain was in Plaintiff's back, but radiated to her legs, and was present at all times. (R. 64.) Any activity made the pain worse. (R. 63.) Plaintiff woke up many times during the night because of the pain, and was unable to sleep reliably. (R. 83.)

Plaintiff stated that icing helped alleviate her back pain, (R. 63), as did elevating her legs, which she usually did for "quite some time" each day. (R. 65.) She also needed to lie down for most of the day to relieve the pain, (R. 75), and would apply ice while doing so for half an hour to an hour, at least four times per day. (R. 93.) Plaintiff also stated that she had undergone a number of epidural injections as treatment for her pain. (R. 66.) She was currently recommended to receive two injections per month, but had been undergoing the treatment less frequently because she lived in Missouri but was seeing Dr. Goodman in Chicago. (R. 67-68.) When asked if she was unable to find a medical provider in Missouri, Plaintiff replied that she "liked Dr. Goodman and it was kind of . . . an excuse to come back and see my father, because my father is a quadriplegic. He was in a motorcycle accident. So I kind of like coming back." (R. 68.) The radio frequency ablation helped initially, but that her pain had soon returned. (R. 93.) Although she continued to experience pain, she testified that Dr. Goodman had not recommended surgery because he said Plaintiff was "too young." (R. 69, 89.) Plaintiff testified that she was currently prescribed Opana ER and Roxicodone for her pain, as well as a muscle relaxant. (R. 57.)

Plaintiff also testified as to the extent of her physical abilities. She was unable to lift a gallon of milk, and that it hurt to even hold her purse. (R. 69-70.) Plaintiff testified that she could sit or stand only "for a little bit" because of the pain, and would have to constantly move and change positions. (R. 70.) She did not walk "very much." (R. 71-72.) She stated that she was unable to bend at the waist to

pick something up off the floor, or to squat at the knees. She was able to stoop, but could not pick up small objects. (R. 73.) She had difficulty showering or performing personal care activities, and was unable to complete any household chores. (R. 83-84.) She cooked only premade meals, and was unable to take out the trash or do yardwork. (R. 85.) She was also unable to pick up her youngest child or to take her children to school. (R. 88-89.)

### D. **Vocational Expert Testimony**

At the hearing, the ALJ also questioned Vocational Expert ("VE") Grace Gianforte. The VE identified Plaintiff's past work as certified nursing assistant, van driver, biller, receptionist, and cashier. (R. 99.) The ALJ then asked the VE questions regarding a hypothetical person with the same age, education, and work experience as Plaintiff. The ALJ first limited this hypothetical individual to occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing or walking for two hours in an eight-hour workday, and sitting for six hours of an eight-hour work day. The individual was also limited to only occasionally bending, kneeling, crouching and crawling, and could not climb ropes or scaffolds. (R. 100.) The VE answered that the person could perform Plaintiff's past work of biller and receptionist. (R. 101.) The ALJ then further limited the individual to sedentary work only, with permission to change position every thirty minutes, and to only occasional bending, kneeling, crouching and crawling, but never climbing ladders, ropes or scaffolds. (R. 101.) The VE stated that this did not change her answer. The ALJ also asked if there was other work in the national

economy that the hypothetical individual could perform, and the VE stated that the individual could perform the jobs of credit clerk, surveillance monitor, and addressing clerk. (R. 103.)

E.     **ALJ Decision**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her onset date of January 17, 2008. At step two, the ALJ concluded that Plaintiff had severe impairment of degenerative disk disease. The ALJ concluded at step three that the impairments, alone or in combination, did not meet or medically equal a Listing. The ALJ then determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the additional limitations that Plaintiff was able to stand or walk for only two hours of an eight-hour day and sit for six hours of an eight-hour day. (R. 28.) Plaintiff was further limited to only occasionally bending, kneeling, crouching, or crawling, and could never climb ladders ropes, or scaffolds. *Id.* Based upon the VE's testimony and Claimant's age, education, work experience and RFC, the ALJ concluded at step four that Plaintiff could perform her past work of clerical biller and receptionist, leading to a finding that she was not disabled. (R. 34.) In the alternative, the ALJ concluded at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy. (R. 35.)

## DISCUSSION

### I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps 1 through 4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

### II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,

shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). In rendering a conclusion, an ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005)) (internal quotation marks omitted).

## III.  ANALYSIS

Plaintiff argues that the ALJ's decision should be reversed because the ALJ failed to adequately weigh the opinion of one of her treating physicians, Dr. Ira Goodman, and—as a result of this failure—failed to include all of Plaintiff's limitations in the her questions to the vocational expert. But because the ALJ adequately considered the evidence from Dr. Goodman, and because the ALJ's determination of Plaintiff's credibility as to the extent of her impairments was not patently wrong, the ALJ did not err and her decision is affirmed.

## A. Consideration of Dr. Goodman's Opinion

Plaintiff argues first that the ALJ erred by failing afford the opinion of one of her treating physicians, Dr. Ira Goodman, controlling weight. In May 2012, Dr. Goodman submitted a "pain report" for Plaintiff. (R. 814-15) In this report, Dr. Goodman stated that Plaintiff's impairments had lasted twelve months, listed her diagnoses, noted that Plaintiff experienced pain in her lower and upper back and lower extremities upon bending and lifting, and stated that her "medication manages the pain but does not provide 100% relief." (R. 814-15.) On the report, Dr. Goodman also checked "yes" to affirm the statement that Plaintiff's "pain markedly impact[s] upon the ability to sustain concentration and attention, resulting in frequent failure to complete tasks," and "No" to deny a question asking whether Plaintiff was "able to function in a competitive work setting . . . on an eight hour per day, five days per week basis." (R. 815.) After an extensive review of the treatment notes in her opinion, the ALJ declined to credit Dr. Goodman's conclusions. (R. 34.) As her reasons for discounting Dr. Goodman's conclusions, the ALJ noted that the opinion "was vague with no specific functional limitations," that Dr. Goodman's opinion was "not supported by the treatment notes, which merely recount the claimant's symptoms rather than state objective findings," and that "the handwriting does not match the signature." *Id.* Plaintiff argues that the ALJ's stated reasons for discounting Dr. Goodman's opinion were legally insufficient, and that the ALJ was bound to give Dr. Goodman's opinion controlling weight.

An ALJ must give controlling weight to a treating physician's opinion if the opinion is both "well-supported" and "not inconsistent with the other substantial evidence" in the case record, 20 C.F.R. § 404.1527(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and must otherwise "offer good reasons for discounting" that opinion. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted); *Scott*, 647 F.3d at 739. In this case, while the ALJ's rationale was not perfect, she nonetheless adequately assessed Dr. Goodman's opinion.

With respect to the ALJ's conclusions that Dr. Goodman's opinion was "vague with no specific functional limitations" and was unsupported by the doctor's treatment notes, Plaintiff contends that the ALJ's marking "no" next to a box which asked whether Plaintiff was "able to function in a competitive work setting . . . on an eight hour per day, five days per week basis" was sufficient to require the ALJ to give Dr. Goodman's opinion controlling weight. (Pl.'s Mem. at 10-11.) This, however, is incorrect: rather than an analysis of Plaintiff's limitations, this determination by Dr. Goodman simply amounts to an assertion that Plaintiff was disabled. "A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.' Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1572(d)(1). Furthermore, the form on which Dr. Goodman presented this conclusion—while listing Plaintiff's diagnoses and reports of pain—did not describe any medical evidence or findings on which those assessments were based. While a treating source's physician is due

controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1527(c)(2), Dr. Goodman provided no such findings to support his opinion. This was a sufficient ground on which to deny Dr. Goodman's opinion controlling weight. *See Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).[5]

Despite this lack of support, Plaintiff contends that Dr. Goodman's opinion was in fact supported by his treatment notes, which she argues "consistently document[ed] Plaintiff's need to sit or lie down several times per day to control pain," "significant interference with normal activities of daily living [due to pain]," and "Plaintiff's mild or moderate pain behavior." (Pl.'s Mem. at 11.) It is true that the treatment notes from providers in Dr. Goodman's practice (including those from Dr. Goodman himself) record Plaintiff's problems with sleep, her need to sit or lie down during the day, and her inability to perform activities of daily living. (R. 758-59, 768-69, 771, 775, 782.) However, rather than medical findings by Dr. Goodman, those notes instead reflect Plaintiff's self-reports as to her symptoms. Rather than supporting any medical conclusions, however, such "subjective complaints are the opposite of objective medical evidence and, while relevant, do not compel the ALJ to accept [a physician's] assessment." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). Rather than simply accepting Plaintiff's allegations as to the extent of her impairments through Dr. Goodman's treatment notes as a medical conclusion, "the

---

[5] Plaintiff also argues that Dr. Goodman's opinion should have been credited according to SSR 96-9p. That ruling, however, discusses the "implications of a residual functional capacity for less than a full range of sedentary work," and does not address the standards by which an ALJ must review medical source evidence. Accordingly, SSR 96-9p does not bear on the appropriateness of the ALJ's evaluation of Dr. Goodman's opinion.

ALJ properly discounted Dr. [Goodman]'s medical opinion that rest[ed] entirely on the claimant's subjective complaints." *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *see also White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). The ALJ did not err when she found Dr. Goodman's opinion unsupported by medical evidence.

Plaintiff does point to one treatment note from Dr. Goodman, from April 26, 2012, in which Dr. Goodman states: "I think the current disk abnormalities could explain [Plaintiff's] complaints, especially the findings at L5-S1." (R. 795.) To the extent that this one note provides Dr. Goodman's reasoning for his conclusions in the evaluation,[6] the ALJ did not err in failing to accord Dr. Goodman's opinion controlling weight. Even assuming that this one notation in one treatment note unreferenced by the medical opinion provided sufficient support to render Dr. Goodman's opinion rendered elsewhere "well-supported," a treating physician's opinion must also be "not inconsistent with the other substantial evidence" in order to command controlling weight. 20 C.F.R. § 404.1527(c). As the ALJ noted in her summary of the evidence, however, numerous physicians had determined that Plaintiff's condition did not result in significant impairments in the manner she

---

[6] In order to receive Disability Insurance benefits, a claimant must prove disability on or before the date that insured status under the statute and regulations—which in certain cases such as Lugo's is based on a claimant's work history—expires. *See* 42 U.S.C. § 416(i)(3); 20 C.F.R. § 404.130(b); *Meredith v. Bowen*, 833 F.2d 650, 652 n.1 (7th Cir. 1987). The date on which insured status lapses is often referred to as a claimant's "date last insured." *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Entitlement to Supplemental Security Income benefits, in contrast, is based on a claimant's income and assets instead of her work history, and therefore does not depend on the date last insured. *See* 42 U.S.C. § 1382(a); *Carter v. Colvin*, 556 F. App'x 523, 526 n.2 (7th Cir. 2014). Much of the treatment provided by Dr. Goodman—as well as his opinion as to Plaintiff's disability—was rendered after Plaintiff's date last insured of March 31, 2010. (R. 25.) The ALJ, however, did not rely on the date last insured in rendering her decision, and the parties do not advance significant argument on this point.

claimed, including her treating physicians Dr. Bair (R. 30-31) and Dr. Bardfield, (R. 30-31), as well as Dr. Singh (R. 33) and state agency physicians Dr. Oh and Dr. Bilinsky. (R. 33.) Even assuming Dr. Goodman's opinion was adequately supported by medical evidence, then, the contradictory opinions of these other physicians provided a sufficient ground for the ALJ's decision to deny Dr. Goodman's opinion controlling weight. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) ("[I]n this case one examining physician's opinion was contradicted by several other examining and non-examining physicians' opinions. After weighing the evidence, the ALJ opted to believe the latter group of experts. The ALJ's decision . . . was supported by substantial evidence.").

Plaintiff also argues that the ALJ erred when she discredited his opinion in part because the handwriting in which the substance of the report was recorded did not match the signature. Plaintiff argues this was improper because—even if Dr. Goodman did not personally prepare the report—he nonetheless endorsed its contents by signing it. (Pl.'s Mem. at 10.) In response, the Commissioner simply states that the ALJ's decision was otherwise adequately supported and that any error on this point is harmless. Although neither party submits authority on this issue, the Commissioner is correct: even assuming the ALJ's reliance on the handwriting discrepancy constitutes error, the Court is satisfied that correcting the error would not result in a different decision on remand given that the ALJ appropriately considered the support Dr. Goodman appropriately assessed Dr. Goodman's opinion as described above. Accordingly, any error on this point was

harmless. *See Simila*, 573 F.3d at 516 (holding error harmless "given the other reasons the ALJ cited for discounting [the physician's] opinions.").

Finally, Plaintiff contends that the ALJ erroneously discounted Dr. Goodman's opinion because she found that Plaintiff had engaged in "drug-seeking behavior." (Pl.'s Mem. at 12-13.) But the premise of this argument is incorrect: while the ALJ's decision did reference what the ALJ interpreted as drug-seeking behavior by Plaintiff, (R. 31-32), this was not one of the reasons the ALJ gave for declining to give Dr. Goodman's opinion controlling weight, which were given in a separate portion of the opinion. (R. 34.) Instead, the reference to alleged drug-seeking behavior relate to the ALJ's assessment of Plaintiff's credibility, which she does not separately challenge. Plaintiff's contention on this point is therefore meritless. As described above, the ALJ did not err in determining the weight to be given to Dr. Goodman's opinion.

## B. Determining Plaintiff's Residual Functional Capacity

Plaintiff also argues that the ALJ erred in evaluating her RFC. A claimant's RFC "is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008); *see* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2.[7] In determining a claimant's RFC, the ALJ must consider all of a claimant's impairments, even those that are not severe. *See* 20 C.F.R. § 404.1545(e). An ALJ's RFC determination must be

---

[7] Interpretive rules, such as Social Security Rulings ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

"based on all of the relevant medical and other evidence" in the record, 20 C.F.R. §
404.1545(a)(3), and the ALJ "cannot simply cherry-pick facts that support a finding
of non-disability while ignoring evidence that points to a disability finding. But an
ALJ need not mention every piece of evidence, so long he builds a logical bridge
from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir.
2010) (citation omitted).

Plaintiff first contends that the ALJ's RFC determination was erroneous
because the ALJ failed to specifically mention the treatment notes from Dr.
Goodman that were discussed above. She contends that these notes demonstrate
Plaintiff's need to lie down during the day and inability to concentrate because of
her pain; by overlooking this evidence which was contrary to the ALJ's ultimate
determination, Plaintiff contends the ALJ erred. It is true that the ALJ did not
specifically mention Plaintiff's complaints as recorded in Dr. Goodman's treatment
notes in her opinion. Despite this omission, however, the ALJ nonetheless provided
an adequate analysis of the evidence from Dr. Goodman and therefore did not err.

While not specifically referencing the treatment notes, the ALJ did not
overlook plaintiff's claims as to these impairments in her opinion: the ALJ
addressed Plaintiff's complaints that her pain—which Plaintiff testified began as an
eight out of ten and reached a ten out of ten every day—was constant and rendered
her unable to concentrate. (R. 29.) And she explicitly noted Plaintiff's complaints
that—due to her pain—she could not stand for long periods of time and needed to lie
down for "most of the day." (R. 33.) Furthermore, although the ALJ did not mention

these complaints explicitly in relation to Dr. Goodman's treatment notes, the ALJ provided an exhaustive review of the notes themselves, which she stated documented Plaintiff's complaints of pain over time and in relation to the treatment she had received. (R. 31-33.) Despite failing to discuss Plaintiff's specific complaints as recorded in Dr. Goodman's notes, the ALJ did not overlook the evidence relating to Plaintiff's claims as to her limitations.

Also, the reasons the ALJ gave for finding that these limitations were not part of plaintiff's RFC were supported by the record. In addition to other reasons, the ALJ noted that—despite Plaintiff's assertions as to the disabling nature of her pain—she had undergone only conservative treatment, which did not include recommendations for surgery. *Id.* The ALJ also correctly noted that, while Plaintiff stated that she had no undergone surgery because Dr. Goodman had deemed her "too young," (R. 68-69), there was no evidence of such a conclusion from Dr. Goodman. The ALJ also noted that the objective medical evidence contradicted Plaintiff's claims as to the extent of her impairments, specifically that—while Plaintiff had seen multiple physicians over time for her pain—her treating physicians Dr. Bair (R. 642) and Dr. Singh (R. 534) both reported that she was able to return to work, that Dr. Bardfield did not recommend any permanent work restrictions because he believed Plaintiff's condition would improve with time, (R. 511), and that state agency physicians Drs. Oh (R. 704-11) and Bilinsky (R. 747-49) also concluded that Plaintiff could perform medium work. Plaintiff's examinations also had regularly shown her to have full strength, reflexes, and range-of-motion,

her initial MRI showed only "a tiny disk protrusion," (R. 547), and her follow-up MRI—during her reports of worsening pain—noted only mild changes. (R. 790.) The ALJ also noted discrepancies regarding Plaintiff's activities of daily living, including that—while Plaintiff testified at the hearing that she was completely inactive during the day as a result of her daily pain, (R. 82-83)—she had reported elsewhere that she was able to take care of her children and perform other activities. (R. 642.) And although Plaintiff had stated at hearing that she was basically unable to drive as a result of the pain, (R. 52, 59-60), she had nonetheless made frequent trips from Missouri (while she was residing there) to Chicago in order to continue treatment with Dr. Goodman. (R. 67-68, 772.)

All of these reasons support the ALJ's credibility determination. *See* 20 C.F.R. § 404.1529(c); SSR 06-7p, 1996 WL 374186, at *3; *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (conservative treatment); *Simila*, 573 F.3d at 518 (lack of objective medical evidence); *Pepper*, 712 F.3d at 369 (activities of daily living). And aside from Plaintiff's claim that the ALJ improperly ignored her complaints as recorded in Dr. Goodman's treatment notes, Plaintiff does not challenge any of the ALJ's asserted bases for her credibility finding. "So long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). That is the case here. Despite not mentioning Plaintiff's specific complaints from the treatment notes, the ALJ nonetheless built a "logical bridge" between the evidence of Plaintiff's complaints of pain and difficulty

concentrating over time and her ultimate RFC conclusion, and therefore did not err. *See Green v. Colvin*, 605 F. App'x 553, 558 (7th Cir.), *cert. denied*, 136 S. Ct. 187 (2015) ("It is true that the ALJ did not mention that [claimant] had reported having headaches or shoulder pain at several appointments. But 'an ALJ need not mention every piece of evidence' as long as the ALJ has not 'cherry-picked facts' to support her conclusion."); *see also Wleklinski v. Colvin*, No. 11 C 3277, 2013 WL 4506769, at *10 (N.D. Ill. Aug. 23, 2013).

Along similar lines, Plaintiff contends that—because the ALJ failed to include the limitations that Plaintiff had noted to Dr. Goodman in the ALJ's question to the VE—those questions were legally insufficient. (Pl.'s Mem. at 14.) Testimony from a vocational expert is used in situations in which the Administration must establish that someone with the claimant's RFC is able to perform either her past work or other work existing in the national economy. *See* 20 C.F.R. § 404.1560; *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). Accordingly, in order to support a finding that a claimant can perform such past work, the "hypothetical question to the vocational expert must include all limitations supported by medical evidence in the record." *Young*, 362 F.3d at 1003.

In her hypothetical to the vocational expert, the ALJ limited the individual's RFC to light work with a number of additional restrictions, (R. 100-01), but did not include the limitations related to a need to "sit or lie down several times per day due to pain" or "significant difficulty with thinking/concentrating," as Plaintiff contends she should have. However, there was no error in this omission. While an

ALJ must include all of a claimant's limitations in the questions to the VE, "the ALJ

is required only to incorporate into his hypotheticals those impairments and

limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th

Cir. 2007). In this case, as described above, the ALJ made clear that she found that

Plaintiff's complaints as to her need to sit or lie down and her difficulty thinking

and concentrating were not credible. In her decision, the ALJ acknowledged that

she had not fully credited Plaintiff's statements as to the extent of her impairments,

and went on to specify the reasons for that finding which are supported by the

record. (R. 33.) This was a determination the ALJ was entitled to make. *See* 20

C.F.R. § 404.1529(c). And, as described above, this decision was not "patently

wrong" and therefore is entitled to deference by the Court.

The ALJ did not overlook evidence in Dr. Goodman's treatment notes when

he rendered his determination as to Plaintiff's RFC. And because the ALJ

sufficiently supported his finding as to credibility (which Plaintiff does not

separately challenge), there was no error in finding that Plaintiff's limitations did

not have effects as severe as Plaintiff contended, and therefore no error in the ALJ's

questions to the vocational expert.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 12] is DENIED and the Commissioner's cross-motion for summary judgment [Doc. No. 20] is GRANTED. Judgment will be entered in favor of the Commissioner.

**SO ORDERED.**                    **ENTERED:**

**DATE:**     **March 8, 2016**      _____

                                            **HON. MARIA VALDEZ**
                                            **United States Magistrate Judge**